

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*United States District Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

September 5, 2008

**BY HAND**
The Honorable Kenneth M. Karas
United States District Judge
Southern District of New York
United States Courthouse
300 Quarropas Street
White Plains, New York 10601

Re:     **United States v. Darryl Harris,**
          **07 Cr. 1134 (KMK)**

Dear Judge Karas:

The Government respectfully submits this letter to advise the Court about certain evidence that the Government seeks to offer at trial pursuant to Rule 404(b) of the Federal Rules of Evidence.

## I.     BACKGROUND

On October 11, 2007, as charged in the current Indictment, the defendant and another accomplice robbed the JP Morgan Chase Bank in Ardsley, New York, taking approximately $21,000. The Government expects that the proof at trial will demonstrate that while the defendant's accomplice – also his cousin – held bank employees and customers at bay by brandishing a gun, the defendant vaulted over the teller counter and stole money from the teller's drawers. The defendant and his accomplice ran out of the bank, through the parking lot, and into a getaway car, a gold Acura MDX, driven by another accomplice.

On January 31, 1997, the defendant and his co-defendant, David Marshall (his cousin), pleaded guilty in the United States District Court for the Western District of Louisiana, to the bank robbery of the Premier Bank in Shreveport, Louisiana, on March 1, 1996, at which time they took approximately $27,000. At the plea proceedings, the defendant stipulated to the following facts:

[On] March 1, 1996, the Premier Bank on West 70th Street, which is federally-chartered bank and FDIC-insured, was robbed by two black males wearing masks at about mid-morning. Approximately $27,000 was taken in cash by the two men. One stood at the door while the other jumped the counters and robbed the tellers. Both men acted as if they had guns both by administering hand gestures into their clothing and statements to the effect to give up all the money or they would shoot the tellers.

After taking the money, they ran out of the bank to a parking lot of an apartment complex nearby where they jumped into a car and sped away. In the parking lot, there were two women who observed one black male with very long dreadlocks throwing something into a Dumpster. The women remember the car they jumped into because it sped off at a high rate of speed, nearly hitting the two women. A face mask was recovered from the Dumpster. At that time, Darrell Harris had long dreadlocks hairstyle.

A tipster reported to the Shreveport police department that the two bank robbers lived in an apartment complex together. Based upon this and other information, the police talked to the mother of David Marshall. The mother's name is Bernadette Harris. Ms. Harris reported that her son, David Marshall, had been staying with her and her husband in an apartment for about three weeks before this robbery. Darrell Harris was also staying with them. On the morning of the robbery, David Marshall borrowed her car and some hours later both Mr. Harris and Mr. Marshall returned to the apartment carrying a black backpack which belonged to her full of large amounts of cash. She observed the two men splitting up the money. David Marshall then told her that they had guns when in fact they didn't. The mother did not note there were any firearms. Later that afternoon, Darrell Harris left and took a taxi to the bus station to take a bus to New York City. Ms. Bernadette Harris reports that David Marshall left the next morning by going to the airport where he took a flight to New York City.

See Exhibit A at 17-19; see also Presentence Investigation Report (revised March 28, 1997) ("PSR") ¶¶ 1-16.[1]

On or about April 30, 1997, the defendant was sentenced to 51 months'

---

[1]     Defense counsel has been provided with a copy of the plea allocution, as well as a copy of the Presentence Investigative Report ("PSR") prepared in advance of the defendant's sentencing for his 1997 bank robbery conviction in the Western District of Louisiana. If the Court desires a copy of the 1997 PSR, the Government will be happy to provide it to the Court.

imprisonment on the bank robbery conviction, to be served consecutively to 36 months' imprisonment for violating the terms of his supervised release stemming from an armed robbery conviction in the Eastern District of North Carolina in 1992.[2] *See* Judgment of Conviction (Exhibit B).

## II.    EVIDENCE THE GOVERNMENT SEEKS TO OFFER PURSUANT TO RULE 404(B)

The Government seeks to offer evidence of the defendant's prior bank robbery in 1996 in Shreveport, Louisiana, pursuant to Rule 404(b).

Rule 404(b) in relevant part provides:

Evidence of other crimes, wrong, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as poof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The Second Circuit "follows an 'inclusionary' approach to 'other crimes, wrongs, or acts' evidence, under which such evidence is admissible unless it is introduced for the sole purpose of showing the defendant's bad character, or unless it is overly prejudicial under Fed. R. Evid. 403 or not relevant under Fed. R. Evid. 402." *United States v. Carlton*, 2008 WL 2745365 at *3 (2d Cir. July 16, 2008) (quoting *United States v. Pascarella*, 84 F.3d 61, 69 (2d Cir. 1996)).[3] "Rule 404(b) permits evidence of similar acts to prove a 'signature crime,' *i.e.*, a *modus operandi* where the crimes are so nearly identical in method as to ear-mark them as the handiwork of the accused." *United States v. Mills*, 895 F.2d 897, 907 (2d Cir. 1990) (citation

---

[2]    The defendant was also convicted of armed bank robbery in North Carolina in 1992. During that robbery, the defendant brandished a weapon, demanded the tellers put the money in a plastic bag, fled on foot, and was apprehended when a dye pack exploded soon thereafter. *See* PSR ¶ 44. The Government is not seeking admission of this prior act.

[3]    As a general matter, it is well settled that evidence of "other acts" is admissible under Rule 404(b) if certain conditions are satisfied. The "other acts" evidence must (1) be advanced for a proper purpose; (2) be relevant to the crimes for which the defendant is on trial; and (3) have probative value which is not substantially outweighed by any unfair prejudicial effect. If requested, such evidence must be admitted with limiting instructions to the jury. *See United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993); *United States v. Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990) (citing *Huddleston v. United States*, 485 U.S. 681, 691-92 (1988)); *United States v. Smith*, 727 F.2d 214, 219-20 (2d Cir. 1984); *United States v. Siegal*, 717 F.2d 9, 16-17 (2d Cir. 1983); *United States v. Ortiz*, 857 F.2d 900, 903 (2d Cir. 1988) ("[O]ther acts or crimes are admissible under Rule 404(b) to prove matters other than the defendant's criminal propensity").

and internal quotation marks omitted). Proof of prior bad acts has been allowed in this Circuit "to show identity where the defendant used very similar methods in the charged crime and the prior bad act." *United States v. Tubol*, 191 F.3d 88, 95 (2d Cir. 1999); *see also United States v. Carlton*, 2008 WL 2745365 at *3 (affirming the District Court's admission of evidence of the defendant's prior convictions for bank robbery to show identity through a common *modus operandi*); *United States v. Danzey*, 594 F.2d 905, 911 (2d Cir. 1979) (evidence of prior acts probative because there was "a 'close parallel' between the crime charged and the prior act"). "The similarity sufficient to admit evidence of past acts to establish a recurring *modus operandi* need not be complete; it is enough that the characteristics relied upon are sufficiently idiosyncratic to permit a fair inference of a pattern's existence." *United States v. Sliker*, 751 F.2d 477, 487 (2d Cir. 1984) (Friendly, J.); 2 J. Weinstein & M. Berger, *Weinstein's Federal Evidence* § 404.22[5][c], at 404-124 ("The question for the court is whether the characteristics relied on are sufficiently idiosyncratic to permit an inference of pattern for purposes of proof."); *see also United States v. Rucker*, 586 F.2d 899, 903 (2d Cir. 1978) (sufficient parallel between charged acts and prior conviction such that prior conviction had "real probative value"); *cf. United States v. Almendares*, 397 F.3d 653, 662 (8th Cir. 2005) (before admitting identity evidence on modus operandi theory, "district court must make a threshold determination that a reasonable juror could find from comparing the acts that the same person committed both crimes"). The Court has broad latitude in determining whether to admit evidence pursuant to Rule 404(b), and its ruling will be reviewed only for abuse of discretion. *See LaFlam*, 369 F.3d at 155-56.

In determining whether prior robberies are sufficiently similar to a charged robbery to permit a fair inference as to the existence of a pattern and, consequently, as to the identity of the perpetrator of the charged crime, courts have engaged in a fact-intensive inquiry and considered a combination of factors, including, among others: (1) the style of the robberies; (2) the types of institutions robbed; (3) the timing of the robberies and the days of the week on which they occurred; (4) the number of accomplices involved in the robberies; (5) the weapons used during the robberies; and (6) the means of flight following the robberies. *See, e.g., Carlton*, 2008 WL 2745365 at 3; *United States v. Danzey*, 594 F.2d 905, 911 (2d Cir. 1979).

A.  **Commonalities Between the Instant Offense and the Defendant's Prior Bank Robbery**

The Government expects the evidence to show the following commonalities between the instant offense, on the one hand, and the bank robbery the defendant previously committed, admitted, and was convicted of in Louisiana, on the other hand. As the Second Circuit noted in *Carlton*, "[w]hile any of the similarities between the prior bank robberies and the charged crime – such as location, the takeover style of the robberies, or use of a getaway car – when viewed in isolation may not have established a *modus operandi*, taken together, they establish the existence of a pattern." *United States v. Carlton*, 2008 WL 2745365 at *3. As detailed below, in both robberies the defendant utilized a strikingly similar tactical plan, with marked overlaps in the chosen locations, the timing, and the specific conduct.

4

1.    Style of Robberies

Here, as in *Carlton*, the defendant's prior robbery and the instant offense were conducted "takeover style." *See* Ex. A at 18; PSR ¶ 9. In the Louisiana robbery, as in the Arsdley Chase bank robbery, the defendant and a cousin entered the bank wearing masks. *Id.* In both bank robberies, one man stayed in the lobby area brandishing, or attempting to create the appearance that he was brandishing,[4] a firearm to keep the employees and customers at bay, while the other perpetrator vaulted over the teller counter, took money from the teller drawers, and lept back over the counter. *Id.*

Courts have considered the "takeover style of the robberies" to be indicative of a *modus operandi*. *Carlton*, 2008 WL 2745365 at 3; *United States v. Quinn*, 18 F.3d at 1466. Rather than slip a note to an individual teller or the like, the defendant and his accomplices burst into the bank wearing masks, displayed weapons to control the occupants of the bank, lept over the counter, and took money from individual teller's drawers. In and of itself, and contrary to what is often depicted in movies, this is a far from common method for robbing a bank. Notably, although the government does not intend to rely on statistical evidence, less than two percent of the bank robberies committed in the Southern District of New York between January 1, 1998, and July 3, 2006, were takeover-style robberies involving counter vaulting. *See United States v. Carlton*, No. 07-2344-cr, Government Brief at 27 (Dec. 28, 2007).[5]

Vaulting over the counter to gain access to the teller drawers is yet another similarity in the defendant's execution of the Ardsley Chase bank robbery and the Louisiana bank robbery.[6] *See* Ex. A at 18; PSR ¶ 9. Courts have also admitted prior act evidence to prove identity where the specific method of robbing the bank involved vaulting the counter, taking money from the tellers, and vaulting back over the counter. *See United States v. Danzey*, 594 F.2d at 911; *Mack*, 258, F.3d at 554-55 (listing vaulting as one element in signature style).

---

[4]    In the Louisiana bank robbery, the perpetrators made "gestures" that suggested that they had a weapon, but no firearm was found or observed. *See* Ex. A; PSR ¶ 9. The defendant did stipulate that witnesses "would testify that they believed these men to have guns and they sure felt intimidated and assaulted and they sure felt threatened that these men were going to shoot them." Ex. A at 21.

[5]    In *Carlton*, the Government submitted an affidavit of Special Agent Michael Harkins of the Federal Bureau of Investigations ("FBI") discussing statistics maintained by the FBI on the frequency of various bank robbery methods, including takeover robberies. This information was not provided to the jury at trial, but was considered and relied upon by Judge Robinson in his ruling granting the Government's 404(b) motion in that case.

[6]    The Government did not identify the specific role each robber played in the robbery. PSR ¶ 16.

2.    Types of Institutions

Both the Louisiana bank and the Ardsley Chase bank were small branches with no security guard. *See* PSR ¶¶ 18, 24. The type of institution robbed has been relied upon where the prior and charged robberies involved "small, sparsely-staffed bank branches." *United States v. Smith*, 103 F.3d at 603; *United States v. Mack*, 258 F.3d at 554. The tellers at both banks also were not protected by full glass partitions or so-called "bandit barriers." The Government's evidence will show that this was an important fact to the defendant, whose accomplice "cased" the Chase Bank in advance to confirm the lack of full-length bandit barriers.

3.    Timing of the Robberies

In addition, both robberies occurred in the morning, between 9:00 and 10:00 a.m., late in the week (on Thursday, in Ardsley, and on Friday, in Louisiana). *See* Ex. A at 18; PSR ¶ 8. Courts have cited the timing of the prior and charged robberies where "most of the robberies occurred on a Wednesday or Friday morning," *United States v. Mack*, 258 F.3d at 554, or where the robberies "occurred early in the morning between 9:00 and 11:00," *United States v. Danzey*, 594 F.2d at 911.

4.    Number and Relationship of Accomplices

In both the Louisiana robbery and the Ardsley Chase bank robbery, the defendant went into the bank with one accomplice, namely, a cousin. *See* Ex. A at 18; PSR ¶ 58. The number of accomplices involved in a robbery has been considered a significant factor where, for example, "[t]hree or four men were always involved in the robbery." *Danzey*, 594 F.2d at 911. That the defendant chose to conduct both robberies with a relative is even more compelling.

5.    Means of Flight

In Louisiana, as in Ardsley, the defendant and his cousin had a "getaway" vehicle waiting for them near the bank that they robbed. *See* Ex A at 18; PSR ¶ 11. Courts have found the specific circumstances surrounding the flight from the robberies to be a pertinent factor governing the admissibility of prior act evidence where the robber has used a stolen getaway car, *United States* v. *Danzey*, 594 F.2d at 911.

**B.    Discussion**

The case law demonstrates that whether or not a prior robbery is properly admitted is and must be a highly fact-specific inquiry. The common elements discussed above are similar in kind to those routinely relied upon by appellate courts affirming the admission of such evidence. The Second Circuit has affirmed the admission of such evidence in bank robbery cases. *See Carlton*, 2008 WL 2745365 at 3; *Sappe*, 898 F.2d 878; *Danzey*, 594 F.2d 905. In *Carlton*, the court affirmed the admission of evidence of the defendant's prior bank robberies

6

where the District Court considered the "signature style" of a takeover robbery that involved vaulting the bank counter, as well as:

> that similar types of institutions were used. These were branches of banks that were selected because they didn't have . . . partitions, that these sites were then scouted in similar manners. . . . The defendant's role in these robberies were similar, that is, that he is the gunman, that he then also monitored the time in at least two, if not all, of the bank robberies. These banks were chosen to be robbed on . . . Thursday or Friday. . . . Again, similar types of weapons were used. All of these banks were robbed in Westchester County. All of the getaway vehicles were abandoned in a similar fashion, and that the number of individuals involved in these bank robberies were similar, with similar roles being used by the participants.

*See United States v. Carlton*, No. 07-2344-cr, Government Brief at 32-33, *citing* Appendix 68-69 (Dec. 28, 2007).

In *Sappe*, the defendant had a "distinctive method for robbing banks," involving hiding a pistol in a newspaper and laying the paper on the teller counter. Notwithstanding the fact that the defendant "cite[d] a number of cases involving a gun hidden in a newspaper in an effort to show that his modus operandi was too common to constitute a signature, the Second Circuit disagreed. 898 F.2d at 879. In another case, *Danzey*, the defendant's self-described "trademark" style of robbery included a large number of common elements such as: (i) the use of stolen getaway cars and "switch cars" (in contrasting colors); (ii) the use of a ski mask, gloves, and two sets of clothes; (iii) the involvement of "[t]hree or four men;" (iv) the defendant vaulting over the counter, sometimes accompanied by a "second vaulter"; and (v) the use of a gunman to control the people in the bank. 594 F.2d at 911. Recognizing that such evidence "is always highly prejudicial," the Second Circuit affirmed its admission, noting that "all the time, critical evidence may well be prejudicial, but it is admitted because it is so clearly relevant and so highly critical." 594 F.2d at 915.

Likewise, in *United States v. Mack*, the Sixth Circuit affirmed the District Court's finding that

> three elements, when viewed in combination, constituted a "signature" due to their uniqueness: (1) the use of a ski mask in conjunction with a hooded sweatshirt, (2) by a person who always burst into the bank and leaped over the teller counter, and (3) then leaped over the teller counter again to leave.

258 F.3d at 553-54. After noting several other similarities (e.g., robberies on Wednesday or Fridays, of "small banks with small staffs," the use of "similar commands") and acknowledging some not insubstantial dissimilarities (e.g., several of the charged robberies involved weapons and an accomplice while the uncharged robberies involved neither), the Sixth Circuit held that

although these common elements "were not particularly unusual," the similarities "in combination, present an unusual pattern constituting a 'signature.'" *Id.* at 554.

        To be clear, the Government is not arguing here that the defendant's prior bank robbery should be admitted solely because, like the robbery of Chase bank, it was conducted takeover style. *See, e.g.*, *United States v. Luna*, 21 F.3d 874, 879-80 (9th Cir. 1994) (reversing the District Court's admission of evidence of prior robberies because the uncharged crimes were similar to the charged conduct only to the degree that they shared "common components" of all takeover robberies such as guns, masks, gloves and bags). Rather, the Government seeks to offer evidence concerning the defendant's prior bank robbery because it was similar to the charged robbery in a number of important ways in addition to the fact that they were conducted takeover style. Here, the consistency in style, type of location, timing of the robberies, number and identity of accomplices, and the method of escape show both robberies were the handiwork of the defendant. For all these reasons, the Government seeks to offer evidence of the prior bank robbery in order to establish the defendant's "identity" pursuant to Rule 404(b).

## III.    CONCLUSION

        For the foregoing reasons, the above-described evidence should be admitted at trial.

                            Respectfully submitted,

                            MICHAEL J. GARCIA
                            United States Attorney

        By:     *Anna Skotko*
                            Anna M. Skotko
                            Assistant United States Attorney
                            Phone: (914) 993-1939

cc:    Larry J. Sheehan, Esq. (by Fax)

8

# EXHIBIT
# A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

UNITED STATES OF AMERICA          *      Criminal Action
                                         No. 96-CR-50060
VERSUS                            *
                                         Shreveport, Louisiana
DAVID J. MARSHALL and             *      January 31, 1997
DARRELL HARRIS                           1:30 p.m.
                                  *
    *   *   *   *   *   *   *   *   *   *

GUILTY PLEA
TRANSCRIPT OF CHANGE OF PLEA HEARING
BEFORE THE HONORABLE TOM STAGG,
UNITED STATES SENIOR DISTRICT JUDGE.

APPEARANCES:

    *For the Government:*         AUSA Robert W. Gillespie, Jr.
                                  AUSA James G. Cowles, Jr.
                                  U.S. Attorney's Office
                                  300 Fannin Street, Suite 3201
                                  Shreveport, Louisiana  71101-3068

    *For Defendant Marshall:*     Mr. Richard B. King, Jr.
                                  Miciotto, King & King
                                  628 Stoner Avenue
                                  Shreveport, Louisiana  71101

    *For Defendant Harris:*       Mr. Gordon N. Blackman, Jr.
                                  Attorney at Law
                                  400 Travis Street, Suite 1801
                                  Shreveport, Louisiana  71101-3196

REPORTED BY:                      Marie Moran Runyon
                                  Official Court Reporter
                                  300 Fannin Street, Room 4212
                                  Shreveport, Louisiana  71101
                                  Phone:  (318) 222-9203

PROCEEDINGS PRODUCED BY MECHANICAL STENOGRAPHY AND TRANSCRIBED
BY COMPUTER.

Certified Copy

```
 1              (Court called to order at 1:30 p.m. with Defendants
 2              present, AUSA Cowles absent.)
 3          THE COURT:  Good afternoon.  Please be seated.
 4   Mr. Harris -- which one is Mr. Harris?
 5          DEFENDANT HARRIS:  (Raises hand.)
 6          THE COURT:  And you are Mr. Marshall?
 7          DEFENDANT MARSHALL:  (Raises hand.)
 8          THE COURT:  Would you come up, gentlemen, with your
 9   counsel to the microphone, please.
10          Mr. Harris, I met a little while ago with
11   Mr. Blackman.  And Mr. Marshall, I was meeting with Mr. King.
12   And they explained what was going on, that you gentlemen wished
13   to plead to one count of the indictment against you.  I'm going
14   to try to do this with you together.  We could do it
15   separately.  It takes about 20 minutes for me to ask the
16   questions I want to ask, so I can do it 20 minutes with you
17   (indicating) and 20 minutes with you (indicating), or I can do
18   it together.  Do you give a damn?
19          DEFENDANT MARSHALL:  Do it together.
20          DEFENDANT HARRIS:  Do it together.
21          THE COURT:  All right.  Mr. Harris and Mr. Marshall,
22   is it your intention to plead guilty to one count of the
23   indictment against you?
24          DEFENDANT MARSHALL:  Yes.
25          DEFENDANT HARRIS:  Yes.
```

1    THE COURT:  Before I can accept your guilty plea,

2    there are a whole lot of questions that I have to ask.

3    DEFENDANT MARSHALL:  Okay.

4    THE COURT:  If at any time when I ask a question, if

5    you have any doubt about how properly and truthfully to answers

6    that question, stop, get away from that microphone, and go talk

7    to your lawyer about it before you answer.  Will you do that?

8    DEFENDANT MARSHALL:  Yes.

9    DEFENDANT HARRIS:  Yes.

10    THE COURT:  Mr. Terry, swear in Mr. Harris and

11    Mr. Marshall.

12    (Defendants sworn.)

13    THE COURT:  And you understand that, having been

14    sworn, if you don't tell me the truth, that fellow back there

15    that works for the United States Attorney's Office might want

16    to add perjury or false statement to your troubles, and you

17    don't need that?

18    DEFENDANT MARSHALL:  We know that.

19    (AUSA Cowles enters courtroom.)

20    THE COURT:  And Mr. Cowles is just in time to come

21    and help Mr. Gillespie.  And Mr. Cowles, you're always welcome.

22    MR. COWLES:  Thank you.

23    THE COURT:  Is it your birthday or your wife's

24    birthday?  I thought you had a birthday party, that's why we

25    couldn't find you?

1          MR. COWLES:  No.  I wish it was.  I'm sorry.  I

2     didn't know this was scheduled.

3          THE COURT:  We did our best to notify everybody.  The

4     reason for this, Mr. Cowles, is that your office established

5     the deadline for a plea as being today.

6          MR. COWLES:  Yes, sir.

7          THE COURT:  And I'm old-fashioned enough to insist

8     that if there's a deadline, then it's a deadline and we don't

9     move it and fudge it and fiddle with it; it's a deadline.  And

10    so we are glad you could come.

11         MR. COWLES:  Thank you.

12         THE COURT:  We had a question that was before the

13    house, and now that you're here, Mr. Gillespie will tell you

14    about it and then you can answer it.  Meanwhile, Mr. Harris and

15    Mr. Marshall and I have business.

16         I don't know you guys from Adam's off ox.  This just

17    came up today.  I need to know something.  First, Mr. Harris,

18    how old are you?

19         DEFENDANT HARRIS:  22.

20         THE COURT:  22?

21         DEFENDANT HARRIS:  Yes.

22         THE COURT:  When you were going to school, sir, how

23    long did you go?

24         DEFENDANT HARRIS:  To the 10th grade.

25         THE COURT:  Where?

1          DEFENDANT HARRIS:  In New York City.

2          THE COURT:  New York?

3          DEFENDANT HARRIS:  Yes.

4          THE COURT:  To the 10th grade?

5          DEFENDANT HARRIS:  Yes.

6          THE COURT:  And say that was, you got that done five,

7    six, seven years ago.  Have you had any other educational

8    attainment?

9          DEFENDANT HARRIS:  While I was incarcerated on my

10   first bid, I was getting a GED.

11         THE COURT:  You got a GED?

12         DEFENDANT HARRIS:  I was taking classes, but I never

13   got to complete it.

14         THE COURT:  You're going to take some more.

15         DEFENDANT HARRIS:  Okay.

16         THE COURT:  All right?  And I want you to do that.

17   If they don't teach you how to use a computer, tell them the

18   judge will raise hell, because that's where it is in the

19   future.

20         DEFENDANT MARSHALL:  That's where we're going.

21         THE COURT:  Mr. Marshall, how old are you?

22         DEFENDANT MARSHALL:  24.

23         THE COURT:  24?

24         DEFENDANT MARSHALL:  24.

25         THE COURT:  You went to school for how long?

1  DEFENDANT MARSHALL:  10th grade.

2  THE COURT:  Where?

3  DEFENDANT MARSHALL:  New York City.

4  THE COURT:  How do I get you guys all the way down

5  here in this kind of trouble?  It's not easy, I guess.  Being

6  guests of the city, I take it that you have not had any

7  alcoholic beverages or pills or pops that fuzz up your brain?

8  DEFENDANT MARSHALL:  No.

9  DEFENDANT HARRIS:  No.

10  THE COURT:  You're each clearheaded, with a full

11  understanding of the nature of the charge against you?

12  DEFENDANT MARSHALL:  Yes.

13  DEFENDANT HARRIS:  Yes.

14  THE COURT:  The charge against you.  The count to

15  which the plea is entered is Count 2, which states that on or

16  about March 1, '96, you went to the bank, Premier Bank, and got

17  $27,000, in violation of United States Code, Title 18, Section

18  2113(a), and that same code, Section 2.  And it is that charge,

19  Mr. Harris, to which you are entering a plea of guilty?

20  DEFENDANT HARRIS:  Yes.

21  THE COURT:  That's correct, sir, Mr. Marshall?

22  DEFENDANT MARSHALL:  Yes.

23  THE COURT:  Mr. Harris, you came here today with

24  Mr. Blackman; and Mr. Marshall, with Mr. King.  Let me ask you

25  guys about those two men.  You know from your previous

1  experience that you have a right to have a lawyer with you at
2  all stages of these proceedings?
3              DEFENDANT MARSHALL:  Yes.
4              THE COURT:  I have two jobs.  One is to see that you
5  have a lawyer.  Got them.  Second is to note for the record
6  whether you have found their legal advice and services to be
7  satisfactory.  Mr. Harris, under oath?
8              DEFENDANT HARRIS:  Yes.
9              THE COURT:  Are you satisfied with the services of
10 Gordon Blackman?
11             DEFENDANT HARRIS:  Yes.
12             THE COURT:  Mr. Marshall, are you satisfied with the
13 services of Richard king?
14             DEFENDANT MARSHALL:  Yes.
15             THE COURT:  He has answered your questions?
16             DEFENDANT MARSHALL:  Yes, he has.
17             THE COURT:  He's been of assistance to you in
18 reaching the place where you decided you wished to enter a
19 plea?
20             DEFENDANT MARSHALL:  Yes.
21             THE COURT:  And you want him to continue to represent
22 you?
23             DEFENDANT MARSHALL:  Yes, I do.
24             THE COURT:  Mr. Harris, the same?
25             DEFENDANT HARRIS:  Yes, sir.

1    THE COURT:  Very well.  Most of my work is over.  I
2    just need to know how much you know about your constitutional
3    rights.  And before I go into that exercise, from what you just
4    said a minute ago about having been into the GED, where were
5    you?
6              DEFENDANT HARRIS:  What institution?
7              THE COURT:  Yes.
8              DEFENDANT HARRIS:  I was in a few of them.
9              THE COURT:  I know.  I understand that this is not --
10   you're not -- I'm not the first guy in a black gadget that you
11   stood before.
12             DEFENDANT HARRIS:  I was in Lewisburg, Pennsylvania;
13   Danbury, Connecticut; Allenwood.
14             THE COURT:  And what did -- did you just get out of
15   prison, each of you, when this affair took place?
16             DEFENDANT HARRIS:  I was released in '95.
17             THE COURT:  Where?
18             DEFENDANT HARRIS:  In New York.
19             THE COURT:  Okay.  And you, Mr. Marshall?
20             DEFENDANT MARSHALL:  I was released in December of
21   '95 in New York.
22             THE COURT:  Well, then, in the occasions before,
23   Mr. Marshall, did you enter a plea of guilty or were you tried?
24             DEFENDANT MARSHALL:  Pleaded guilty.
25             THE COURT:  And you the same?

1        DEFENDANT HARRIS:  Yes.

2        THE COURT:  So you've been to this before?

3        DEFENDANT MARSHALL:  Yes.

4        DEFENDANT HARRIS:  Yes.

5        THE COURT:  I'm not telling you anything new?

6        DEFENDANT MARSHALL:  No.

7        THE COURT:  Good.  More than half of my job is done.

8   You've been there, you've done that.  Let's talk about it.  You

9   know from general knowledge as well as your personal experience

10  that you have a right to tell me that you are not guilty of

11  robbing that bank and that I would put a jury of 12 people over

12  there and they would have to find you guilty beyond a

13  reasonable doubt before you could be convicted, and you both

14  are well aware of that?

15       DEFENDANT MARSHALL:  Yes.

16       DEFENDANT HARRIS:  Yes.

17       THE COURT:  Of the constitutional provision that says

18  that's true?

19       DEFENDANT MARSHALL:  Yes.

20       THE COURT:  Also, that their verdict in this court,

21  different from the state court, their verdict would have to be

22  unanimous, all 12 of them would have to agree, and you

23  understand that?

24       DEFENDANT MARSHALL:  Yes.

25       DEFENDANT HARRIS:  Yes.

1          THE COURT:  And you understand that -- you're both

2   from New York, originally?

3          DEFENDANT MARSHALL:  Yes.

4          DEFENDANT HARRIS:  Yes.

5          THE COURT:  Boy, you could cost the government a pot.

6   You have the right, if there were witnesses that you felt would

7   be helpful in your trial, to use the government's subpoena

8   power to bring such witnesses to court if they didn't want to

9   come.  That's, of course, it has to be a reasonable reason to

10  have them and a reasonable distance to travel, but New York is

11  where you're from and I guess that's where it would be.  You

12  did have that right before you walked in this door today, and

13  you know that?

14         DEFENDANT MARSHALL:  Yes.

15         DEFENDANT HARRIS:  Yes.

16         THE COURT:  And I don't have to tell you that if you

17  had opted for a trial, your lawyers would confront and

18  cross-examine the government's witnesses against you and that

19  you could testify in your own behalf if you wanted to, but you

20  also would have at a trial the right to remain silent, and you

21  know that from your past experience --

22         DEFENDANT MARSHALL:  Yes.

23         DEFENDANT HARRIS:  Yes.

24         THE COURT:  -- and your general knowledge?  What

25  amendment is it in, Mr. Harris?

| | |
|---|---|
| 1 | DEFENDANT HARRIS:  Fifth, I believe. |
| 2 | THE COURT:  You got it.  All right.  Do you know the |
| 3 | difference between that Fifth Amendment provision, between -- |
| 4 | the difference between the Fifth Amendment protection at trial |
| 5 | and the lack of a Fifth Amendment protection at this guilty |
| 6 | plea?  If I ask you a question about the robbery of the Premier |
| 7 | Bank at a guilty plea under oath, you're going to have to tell |
| 8 | me what you did, when you did it, and that you did it, and |
| 9 | there's no Fifth Amendment protection, and you understand that? |
| 10 | DEFENDANT MARSHALL:  Yes. |
| 11 | DEFENDANT HARRIS:  Yes. |
| 12 | THE COURT:  All right.  These are well-known, then, |
| 13 | to you to be the constitutional rights that belong to you, and |
| 14 | they belonged to you when you came in the door.  You are |
| 15 | voluntarily waiving those rights, Mr. Harris? |
| 16 | DEFENDANT HARRIS:  Yes. |
| 17 | THE COURT:  Nobody twisted your arm? |
| 18 | DEFENDANT HARRIS:  No. |
| 19 | THE COURT:  Nobody leaned on you? |
| 20 | DEFENDANT HARRIS:  No. |
| 21 | THE COURT:  Mr. Marshall? |
| 22 | DEFENDANT MARSHALL:  No. |
| 23 | THE COURT:  To both questions? |
| 24 | DEFENDANT MARSHALL:  No.  I mean, yes. |
| 25 | THE COURT:  Your answer is no -- |

 1          DEFENDANT MARSHALL:  "No" two times.

 2          THE COURT:  -- to both questions?

 3          DEFENDANT MARSHALL:  "No" two times.

 4          THE COURT:  All right.  You caught it just in time.

 5   Thank you.

 6          DEFENDANT MARSHALL:  All right.

 7          THE COURT:  Both of these fellows that you brought

 8   with you today are considered by this Court to be totally

 9   competent to represent you, whether you knew that or not,

10   because they're strangers to you.  That's no matter.  You're in

11   good hands.  If you are here to plead guilty and they have

12   advised you to plead guilty and they know the territory, you

13   feel perfectly -- you're not upset by having to come and plead

14   guilty, Mr. Harris?

15          DEFENDANT HARRIS:  No.

16          THE COURT:  Mr. Marshall?

17          DEFENDANT MARSHALL:  No.

18          THE COURT:  Okay.  Being from New York, you don't

19   know how we do our business and --

20          DEFENDANT MARSHALL:  Oh, we know how the federal

21   system do their business.  This is a whole united business, one

22   government.

23          THE COURT:  One government.

24          DEFENDANT MARSHALL:  Yes.

25          THE COURT:  Well, that's right, but then there are

1   differences from place to place among federal courts.

2          DEFENDANT MARSHALL:  Okay.

3          THE COURT:  I don't think all federal judges talk to

4   the orange jumpsuits like I do.

5          DEFENDANT MARSHALL:  Oh, okay.

6          THE COURT:  I know where you are and I know what kind

7   of place it is, and I know as soon as I can get you out of

8   there, you will be better off.  You might not think so, but

9   others that have stood where you've stood and have stayed there

10  longer than you have want out:  "Get me to some nice, clean,

11  well-operated federal prison and I'll be the better for it."

12  Well, I don't know whether that's been your problem or not.  I

13  hope it is not.

14         DEFENDANT MARSHALL:  It is, though.

15         THE COURT:  Would you, Mr. Marshall -- have you got a

16  copy of the Plea Agreement?

17         DEFENDANT MARSHALL:  Yes, I do.

18         THE COURT:  Mr. Blackman, would you give Mr. Harris

19  one.

20         Without looking at that piece of paper, do you know

21  what the maximum penalty provided by law is for bank robbery?

22         DEFENDANT MARSHALL:  Yes.

23         DEFENDANT HARRIS:  Yes.

24         THE COURT:  What is it?

25         DEFENDANT MARSHALL:  Twenty years.

1    DEFENDANT HARRIS:  Twenty years.

2    THE COURT:  And?

3    DEFENDANT HARRIS:  $250,000 fine.

4    DEFENDANT MARSHALL:  $250,000 fine.

5    THE COURT:  And?

6    DEFENDANT MARSHALL:  Two to three years of supervised

7    release.

8    THE COURT:  I'm in the hands of folks that know where

9    they are.  And if you violated the conditions of supervised

10    release at any time, Mr. Marshall, what happens?

11    DEFENDANT MARSHALL:  You can get the maximum of what

12    you would give, even if you serve time on the street.

13    THE COURT:  I couldn't have said it any better.

14    Mr. Harris, that's well-known to you as well?

15    DEFENDANT HARRIS:  Yes.

16    THE COURT:  Tell me what you know about guidelines.

17    You've been in federal court before.  What do you know about

18    the guidelines?

19    DEFENDANT MARSHALL:  I know that in the guidelines it

20    goes by your criminal history and you've got a base offense

21    level for your crime and you've got enhancements as far as the

22    statutes, the statutes that were used in the procedure of the

23    crime, and --

24    THE COURT:  So if I told you to look at that piece of

25    paper and find yourself across the top, where would I find you

1    across those top numbers?

2          DEFENDANT MARSHALL:  Well, to my best knowledge --

3          THE COURT:  To your best knowledge.  I don't know.

4          DEFENDANT MARSHALL:  I see myself in Category IV.

5          THE COURT:  And you, Mr. Harris?

6          DEFENDANT HARRIS:  III.

7          THE COURT:  And down the left-hand side at the

8    offense level, where is bank robbery with $27,000 involved?

9          DEFENDANT MARSHALL:  Base offense level 20.

10         THE COURT:  Twenty?

11         DEFENDANT MARSHALL:  Yes.

12         MR. BLACKMAN:  23, less 3 for acceptance of

13   responsibility.

14         THE COURT:  And for a point score above 16 or 18,

15   whatever it is, if you plead guilty, you don't get just two

16   points off, you get three?

17         DEFENDANT MARSHALL:  Yes.

18         THE COURT:  All right.  You know all that?

19         DEFENDANT HARRIS:  Yes.

20         DEFENDANT MARSHALL:  Yes, we do.

21         THE COURT:  And you know that I don't know what your

22   sentence is going to be until this gentleman over here

23   (indicating) writes the presentence report.

24         You gonna write it?

25         THE PROBATION OFFICER:  Probably not, Your Honor.

1    THE COURT:  Who are you going to have write it?

2    THE PROBATION OFFICER:  Mr. Maples wasn't available

3    to tell me.

4    THE COURT:  Oh, okay.  Well, somebody in that office.

5    THE PROBATION OFFICER:  May be me, Your Honor; I

6    don't know.

7    THE COURT:  Well, they might give you a copy of their

8    old one.  The way they tell me, they've been there before.

9    In the Plea Agreement, look over, if you will, and

10   see on Paragraph 5 where when you come to be sentenced I want

11   $50.

12   DEFENDANT MARSHALL:  Yes.

13   THE COURT:  We'll worry about that.  And you see in

14   Paragraph 6 there may be an order to make restitution because

15   that's what the law requires me to do, and you understand that

16   that might be a part of the penalty as well as the number of

17   years and the number of dollars of fine?

18   DEFENDANT MARSHALL:  Yes.

19   DEFENDANT HARRIS:  Yeah.

20   THE COURT:  All right.  You gentlemen seem well-

21   informed.  Look at the next page after the end, where it says

22   *Elements of the Offense*.  The jury would be told that in order

23   to convict David Marshall of the crime with which he's charged,

24   the government must prove each of the following beyond a

25   reasonable doubt:  First, that Mr. Marshall intentionally took

1  from the person and the presence of the lady listed in the

2  indictment some money.  They could prove that, couldn't they,

3  Mr. Marshall?

4        DEFENDANT MARSHALL:  Yes.

5        THE COURT:  And that they would then be able to prove

6  to the jury that this was a federally insured bank, like all of

7  them are, wouldn't they?

8        DEFENDANT MARSHALL:  Yes.

9        THE COURT:  Piece of cake.  What about the last one,

10  that he did so by force or violence or by means of

11  intimidation; they couldn't prove that, too, couldn't they?

12  That lady would come tell the jury how scared she was?

13        DEFENDANT MARSHALL:  Yeah, she could say that.

14        THE COURT:  Mr. Harris, what about it?

15        DEFENDANT HARRIS:  Yes.

16        THE COURT:  Well, we don't need anything else, except

17  the Government might want to have a stipulation for the record.

18  Would you guys have a chair over there, and we'll get through

19  in just a minute.

20        MR. GILLESPIE:  Your Honor, for the record, I'm going

21  to read into the record the factual basis upon which this plea

22  is based.  On March 1, 1960 -- excuse me.

23        THE COURT:  1996.

24        MR. GILLESPIE:  Yes, sir.  March 1, 1996, the Premier

25  Bank on West 70th Street, which is a federally-chartered bank

1  and FDIC-insured, was robbed by two black males wearing masks

2  at about mid-morning. Approximately $27,000 was taken in cash

3  by the two men. One stood at the door while the other jumped

4  the counters and robbed the tellers. Both men acted as if they

5  had guns both by administering hand gestures into their

6  clothing and statements to the effect to give up all the money

7  or they would shoot the tellers.

8       After taking the money, they ran out of the bank to a

9  parking lot of an apartment complex nearby where they jumped

10  into a car and sped away. In the parking lot, there were two

11  women who observed one black male with very long dreadlocks

12  throwing something into a Dumpster. The women remember the car

13  they jumped into because it sped off at a high rate of speed,

14  nearly hitting the two women. A face mask was recovered from

15  the Dumpster. At that time Darrell Harris had long dreadlocks

16  hairstyle.

17       A tipster reported to the Shreveport police

18  department that the two bank robbers lived in an apartment

19  complex together. Based upon this and other information, the

20  police talked to the mother of David Marshall. The mother's

21  name is Bernadette Harris. Ms. Harris reported that her son,

22  David Marshall, had been staying with her and her husband in an

23  apartment for about three weeks before this robbery. Darrell

24  Harris was also staying with them. On the morning of the

25  robbery, David Marshall borrowed her car and some hours later

1   both Mr. Harris and Mr. Marshall returned to the apartment

2   carrying a black backpack which belonged to her full of large

3   amounts of cash.  She observed the two men splitting up the

4   money.  David Marshall then told her that they had robbed the

5   bank on West 70th Street and bragged about the fact that they

6   were able to fool the people that they had guns when in fact

7   they didn't.  The mother did not note there were any firearms.

8   Later that afternoon, Darrell Harris left and took a taxi to

9   the bus station to take a bus to New York City.  Ms. Bernadette

10  Harris reports that David Marshall left the next morning by

11  going to the airport where he took a flight to New York City.

12          The description given by the women who saw the people

13  leave the bank and throw something in the Dumpster is similar

14  to the physical description of the two defendants in court.

15          THE COURT:  All right.  Mr. Marshall, anything in

16  that description of the event that is different from what you

17  think or you remember?

18          MR. KING:  Your Honor, on Mr. Marshall's behalf, I'd

19  just like to make one objection.

20          THE COURT:  Sure.  Come on up and do it on the

21  record.

22          MR. KING:  I don't believe from the records that I've

23  reviewed and persons that I've spoken with, I don't believe

24  there was any -- I don't believe there's any evidence

25  whatsoever to say that these individuals ever told anyone

1    inside the bank that they had guns whatsoever.  I think that

2    there were some gestures made.  One witness said she might have

3    saw that there was patting of a pants pocket, but at no time

4    has there ever been any weapons ever found, no witness ever saw

5    a weapon.  I think we can stipulate --

6              THE COURT:  I think the record needs that stipulation

7    and I don't believe the government has any objection to it.

8              MR. GILLESPIE:  Yes, Your Honor.  If I didn't say

9    that, I meant to say that.

10             THE COURT:  All right.  The record is reflected in

11   both Mr. Harris and Mr. Marshall.  No problem.

12             MR. BLACKMAN:  And a further clarification, Your

13   Honor.  I also thought I heard some mention of a threat to

14   shoot and I don't recall having read anything that said

15   anything about a threat to shoot.

16             MR. GILLESPIE:  Your Honor, Mr. Cowles is here and

17   I'm reading from his notes, but the tellers felt menaced and

18   intimidated, and they felt there were threats to shoot them.

19             THE COURT:  Well, if that's what they felt, that's

20   intimidation, but it's --

21             MR. GILLESPIE:  That's the only basis for referring

22   to it.

23             THE COURT:  There was no verbal -- if there was no

24   verbal threat to shoot anybody, it doesn't matter that -- it's

25   not going to affect the length or the strength of the sentence.

1    MR. BLACKMAN:  There is the possibility, Your Honor,

2  under the guidelines, depending on how the probation office

3  chooses to interpret them, that if there was use of a firearm,

4  actual demonstrated use under *Bailey* and so forth --

5    THE COURT:  Brandished or otherwise.

6    MR. BLACKMAN:  Exactly.  And so this point needs to

7  be abundantly clear that the only -- my appreciation from

8  reading the witness statements and all else, that when there

9  was some reluctance shown on the part of one of the tellers to

10  carry out the requests of the defendants, that they basically

11  patted their pants pockets or something like that and they then

12  felt intimidated and moved on to carry out the instructions,

13  but there were no verbal threats to shoot or no indication *I've*

14  *got a gun, I'll use it* or anything like that.

15    THE COURT:  Well, I'm sure that somewhere along the

16  way Mr. Cowles took the testimony of these people before the

17  grand jury, and if it's a matter of any importance at all, I

18  call on Mr. Cowles to make some kind of declaration.

19    MR. COWLES:  I agree with the Court, it's not going

20  to make any difference in the guideline calculations

21  whatsoever.  There may be witnesses who would testify that they

22  believed these mens to have guns and they sure felt intimidated

23  and assaulted and they sure felt threatened that these men were

24  going to shoot them.

25    THE COURT:  And now we have an agent who lately has

1  come to the court.

2          MR. BLACKMAN:  Thanks.

3          THE COURT:  All right, gentlemen.  I have --

4          MR. BLACKMAN:  I'll stipulate that they felt that

5  way, that the witnesses felt that way.  I don't have a problem

6  with that.

7          THE COURT:  If I was a witness in -- if I was a

8  teller in the bank and these two guys came at me over the

9  counter, I'd tell them: "Whoa.  Hold it.  What do you need?

10 Get the hell out of here."

11         Let me ask you a question, Mr. Marshall.  You seem to

12 have a reasonably well-based knowledge of the guidelines.  Did

13 anybody make for you any predictions or prophecies or promises

14 as to what your sentence would be if you pled guilty?

15         DEFENDANT MARSHALL:  No.

16         THE COURT:  And you know it's up to me?

17         DEFENDANT MARSHALL:  Yes.

18         THE COURT:  And up to the writer of the --

19         DEFENDANT MARSHALL:  Presentence report.

20         THE COURT:  -- presentence report?  And you know that

21 that will be submitted to you for your correction and

22 approval --

23         DEFENDANT MARSHALL:  Yes.

24         THE COURT:  -- before it comes to me?

25         DEFENDANT MARSHALL:  Yes.

1    THE COURT:  Mr. Harris, same question:  Anybody make

2  you any promises or predictions or prophecies about what your

3  sentence would be if you pled guilty?

4    DEFENDANT HARRIS:  No, sir.

5    MR. BLACKMAN:  To clarify, Your Honor, depending on

6  how you interpret *prophecy*, I certainly worked out the

7  guidelines and pointed out to him what I felt is a correct

8  reading of the guidelines --

9    THE COURT:  Other than what your lawyer might have

10  suggested to you the guidelines would produce, has anybody made

11  you any promises about your sentence?

12    DEFENDANT HARRIS:  No, sir.

13    THE COURT:  Okay.

14    MR. BLACKMAN:  Thank you, Your Honor.

15    THE COURT:  He can't promise you much.  Good as he

16  is, he can't make that promise.  That fellow yesterday who was

17  here will attest to that.

18    Anything else, Mr. Gillespie?

19    MR. GILLESPIE:  Your Honor, in the --

20    THE COURT:  The matter that came up at the conference

21  in chambers --

22    MR. GILLESPIE:  Yes, sir, that's what I was going

23  to address.

24    THE COURT:  -- concerning extrinsic offense evidence,

25  would you speak to that question, please, or Mr. Cowles; either

1  one of you.

2          MR. COWLES:  Your Honor, I'll just state for the

3  record the government is not going to prosecute these men for

4  the other bank robbery that occurred on July 5, 1996.

5          MR. GILLESPIE:  That is the agreement.

6          THE COURT:  That's in the record.

7          MR. COWLES:  In the record.

8          THE COURT:  Period, end of paragraph.  Anything else,

9  Mr. Cowles?

10          MR. COWLES:  No, sir.

11          THE COURT:  Mr. Gillespie?

12          MR. GILLESPIE:  No, sir.

13          THE COURT:  Mr. Blackman?

14          MR. BLACKMAN:  No, sir.

15          THE COURT:  Mr. King?

16          MR. KING:  No, sir.

17          THE COURT:  Mr. Harris?

18          DEFENDANT HARRIS:  No, sir.

19          THE COURT:  Mr. Marshall?

20          DEFENDANT MARSHALL:  No, sir.

21          THE COURT:  I accept the guilty plea of both

22  gentlemen.  I find that they have made a plea which is free and

23  voluntary, that they are fully aware of the charges against

24  them and the maximum penalty, they made a plea agreement with

25  the United States which has been properly executed and filed in

1  the record, and there's a factual basis for the plea.  The

2  clerk is ordered to enter the plea of guilty.

3            Sentencing in this matter will be on Wednesday,

4  April 30.  Would each of the lawyers in the room look at your

5  forward calendar to tell me whether or not that's a date that

6  causes you any problem.  I'm not worried about Mr. Marshall or

7  Mr. Harris; I know where to find them if I need them.

8            MR. COWLES:  That's fine with the Government, Your

9  Honor.

10            MR. KING:  That's an agreeable date, Your Honor.

11            THE COURT:  Agreeable, Mr. King?

12            MR. KING:  Yes, sir.

13            THE COURT:  Mr. Cowles?

14            MR. COWLES:  Yes, sir.

15            THE COURT:  Mr. Blackman?

16            MR. BLACKMAN:  (No response.)

17            THE COURT:  Notify me if there's a conflict, will

18  you?

19            MR. BLACKMAN:  I will, sir.  I'm not aware of any

20  conflict.

21            THE COURT:  1:30, Wednesday, April 30.  All right,

22  gentlemen.  Thank you very much.  Court's adjourned.

23            (Proceedings concluded at 2:30 p.m.)

24

25

```
 1                           Certificate

 2  I hereby certify this 5th day of August, 2008, that the
    foregoing is, to the best of my ability and understanding, a
 3  true and correct transcript from the record of proceedings in
    the above-entitled matter.

 4

 5  _____    /s/ Marie Moran Runyon
                                        Marie Moran Runyon
 6                                      Official Court Reporter

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT
# B

 **NATIONAL ARCHIVES AND RECORDS ADMINISTRATION**

# To all to whom these presents shall come, Greeting:

By virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, under the seal of the National Archives and Records Administration, that the attached reproduction(s) is a true and correct copy of documents in his custody.



| SIGNATURE | |
|---|---|
| *Tuila Gore* | |
| NAME  for C. Preston Huff | DATE  7-17-08 |
| TITLE  Regional Administrator | |

NAME AND ADDRESS OF DEPOSITORY
National Archives and Records Administration
Southwest Region
1400 John Burgess Dr
Fort Worth, TX 76140-6222

*U.S.GPO:1995-387-782/03529

NA FORM 13040 (10-86)

CR-96-50060-02

# United States District Court

U. S. DISTRICT COURT
WESTERN DISTRICT OF LA.
FILED ▨
4-30-97
(DATE)

WESTERN District of LOUISIANA

Robert H. Shemwell, Clerk

β

DEPUTY

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | (For Offenses Committed On or After November 1, 1987) |
| DARRELL HARRIS | **Case Number:** CR-96-50060-02 |
| | Gordon N. Blackman, Jr. |
| | Defendant's Attorney |

## THE DEFENDANT:

[X] pleaded guilty to count ▨ ___two on Friday, January 31, 1997___

[ ] pleaded nolo contendere to count(s) _____
which was accepted by the court.

[ ] was found guilty on count(s) _____
after a plea of not guilty.

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 USC 2113(a) & 2 | Did knowingly and willfully, by force, violence and intimidation, take from the person and presence of another, approximately $27,000.00 in money belonging to and in the care, custody, control, management and possession of the Premier Bank at 5959 W. 70th Street, Shreveport, LA. | 3-1-96 | (2) |

The defendant is sentenced as provided in pages 2 through __5__ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

[ ] The defendant has been found not guilty on count(s) _____

[X] Count ▨ ___one___ (is)(are) dismissed on the motion of the United States.

IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

| | |
|---|---|
| Defendant's Soc. Sec. No.: 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 | April 30, 1997 |
| Defendant's Date of Birth: 6-13-74 | Date of Imposition of Judgment |
| Defendant's USM No.: 14077-056 | _signature_ |
| Defendant's Residence Address: | Signature of Judicial Officer |
| 941 Leggett, Apt. #3E | |
| Bronx, NY   10455 | |
| | TOM STAGG, U. S. DISTRICT JUDGE |
| | Name & Title of Judicial Officer |
| Defendant's Mailing Address: | |
| 941 Leggett, Apt. #3E | JUDGEMENT ENTERED 5/8/97 |
| Bronx, NY   10455 | April 30, 1997 BY _____ |
| | Date   COPY TO Cowles |
| | Blackman |
| | U.S. Collections |

46 Ⓜ

110

Sheet 2 - Imprisonment

DEFENDANT:    DARRELL HARRIS
CASE NUMBER:  CR-96-50060-02

Judgment—Page __2__ of __5__

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of <u>fifty-one (51)</u> months as to count two.  The term of imprisonment imposed by this judgment shall run consecutively to defendant's thirty-six (36) month imprisonment sentence for violation  of his supervised release stemming from an armed robbery con-viction in the U. S. District Court, Eastern District of North Carolina, New Bern Division.

☐  The court makes the following recommendations to the Bureau of Prisons:

☒  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

    ☐  at _____ a.m./p.m. on _____ .

    ☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐  before 2 p.m. on _____ .

    ☐  as notified by the United States Marshal.

    ☐  as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

_____

_____

_____

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
Deputy U.S. Marshal

111

eet 3 - Supervised Rel

Judgment Page ___3___ of ___5___

DEFENDANT:      DARRELL HARRIS
CASE NUMBER:    CR-96-50060-02

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of ___three (3) years___ as to count two.  Defendant shall comply with the standard conditions of supervised release adopted by this Court and shall comply with the following special condition:   (1)  At the direction of the Probation Office, the defendant shall participate in a substance abuse treatment program, to include antabuse and urine surveillance, and if indicated, inpatient treatment.

Defendant is notified of his right to appeal.  If a Notice of Appeal is filed under 18 USC 3742, the Clerk is directed to transmit the presentence report, under seal, to the Court of Appeals.

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state, or local crime.

The defendant shall not illegally possess a controlled substance.

*For offenses committed on or after September 13, 1994:*

The defendant shall refrain from any unlawful use of a controlled substance.  The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as directed by the probation officer.

☐  The above drug testing condition is suspended based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

☒  The defendant shall not possess a firearm as defined in 18 U.S.C. § 921. (Check, if applicable.)

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment.

The defendant shall comply with the standard conditions that have been adopted by this court (set forth below). The defendant shall also comply with the additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)  the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)  the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)  the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)  the defendant shall support his or her dependents and meet other family responsibilities;

5)  the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)  the defendant shall notify the probation officer ten days prior to any change in residence or employment;

7)  the defendant shall refrain from excessive use of alcohol;

8)  the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)  the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;

10)  the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)  the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)  the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

13)  as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

Sheet 5, Part A - Criminal Monetary Penalties

Judgment—Page _____ 4 _____ of _____ 5 _____

DEFENDANT:      DARRELL HARRIS
CASE NUMBER:    CR-96-50060-02

# CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the schedule of payments set forth on Sheet 5, Part B.

| Count | Assessment | Fine | Restitution |
|-------|-----------|------|-------------|
| (2) | $50.00 | -0- | -0- |

\* Due to the length of incarceration and lack of assets, no fine or restitution is ordered. The $50.00 special assessment for the Crime Victim Fund is due immediately and payable to the U. S. Clerk's Office.

☐ If applicable, restitution amount ordered pursuant to plea agreement . . . . . . . . . . . . . . . $ _____

Totals:     $ ___50.00___     $ ___-0-___     $ ___-0-___

## FINE

The above fine includes costs of incarceration and/or supervision in the amount of $ _____ .

The defendant shall pay interest on any fine of more than $2,500, unless the fine is paid in full before the fifteenth day after the date of judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 5, Part B may be subject to penalties for default and delinquency pursuant to 18 U.S.C. § 3612(g).

☐ The court has determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ The interest requirement is waived.

☐ The interest requirement is modified as follows:

## RESTITUTION

☐ The determination of restitution is deferred in a case brought under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after 09/13/1994, until _____ . An Amended Judgment in a Criminal Case will be entered after such determination.

☐ The defendant shall make restitution to the following payees in the amounts listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportional payment unless specified otherwise in the priority order or percentage payment column below.

| Name of Payee | * Total Amount of Loss | Amount of Restitution Ordered | Priority Order or Percentage of Payment |
|---------------|------------------------|-------------------------------|------------------------------------------|
| | | | |

Totals:     $ _____     $ _____

\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994.

Judgment-Page _____ 5 ___ of __5__

DEFENDANT:    DARRELL HARRIS
CASE NUMBER:    CR-96-50060-02

# STATEMENT OF REASONS

☒ The court adopts the factual findings and guideline application in the presentence report.

## OR

☐ The court adopts the factual findings and guideline application in the presentence report except (see attachment, if necessary):

**Guideline Range Determined by the Court:**

Total Offense Level: ___20___

Criminal History Category: ___III___

Imprisonment Range: __41__ to __51__ months

Supervised Release Range: ___2___ to ___3___ years

Fine Range: $ __7,500.00__ to $ __75,000.00__

   ☒ Fine waived or below the guideline range because of inability to pay.

Total Amount of Restitution: $ __27,448.06__

   ☐ Restitution is not ordered because the complication and prolongation of the sentencing process resulting from the fashioning of a restitution order outweighs the need to provide restitution to any victims, pursuant to 18 U.S.C. § 3663(d).

   ☒ For offenses that require the total amount of loss to be stated, pursuant to Chapters 109A, 110, 110A, and 113A of Title 18, restitution is not ordered because the economic circumstances of the defendant do not allow for the payment of any amount of a restitution order, and do not allow for the payment of any or some portion of a restitution order in the foreseeable future under any reasonable schedule of payments.

   ☐ Partial restitution is ordered for the following reason(s):

☒ The sentence is within the guideline range, that range does not exceed 24 months, and the court finds no reason to depart from the sentence called for by the application of the guidelines.

## OR

☐ The sentence is within the guideline range, that range exceeds 24 months, and the sentence is imposed for the following reason(s):

## OR

☐ The sentence departs from the guideline range:

   ☐ upon motion of the government, as a result of defendant's substantial assistance.

   ☐ for the following specific reason(s):

*[handwritten stamp, right side:]*
DATE 4-30-97
BY _____
TO: U.S. MARSHAL
U.S. PROBATION
BUREAU OF PRISONS
SENTENCING REPORTER
GENERAL UNIT
FINANCIAL SECTION
JUDGE STAGG

**114**



UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | * CR. NO. 96-50060 01-02 |
| | * |
| VERSUS | * 18 U.S.C. § 371 |
| | *    Conspiracy |
| DAVID J. MARSHALL | * 18 U.S.C. § 2113(a) |
| DARRELL HARRIS | *    Bank Robbery |
| | * 18 U.S.C. § 2 |
| | *    Aiding & Abetting |
| | * |
| | * JUDGE Stagg |
| | *  MAGISTRATE JUDGE PAYNE |

### INDICTMENT

THE GRAND JURY CHARGES:

### COUNT 1

A.   CONSPIRACY:

From on or about March 1, 1996, and continuing until on or about August 1, 1996, in the Western District of Louisiana and elsewhere, the defendants, DAVID J. MARSHALL and DARRELL HARRIS, and others known and unknown to the members of the Grand Jury, willfully and knowingly did combine, conspire, confederate, and agree together to commit an offense or offenses against the United States, to wit:  Title 18, United States Code, Section 2113(a), that is, to knowingly and willfully, by force, violence, and intimidation, take from the person and presence of another money belonging to and in the care, custody, control, management and

6

possession of Premier Bank at 5959 W. 70th Street, Shreveport, Louisiana, the deposits of which were then insured by the Federal Deposit Insurance Corporation

B.    OBJECT OF THE CONSPIRACY:

The object of the conspiracy was to rob employees and customers of the Premier Bank at 5959 W. 70th Street, Shreveport, Louisiana in order to obtain money from them and the Premier Bank.

C.    OVERT ACTS:

In furtherance of the conspiracy and to effect the object thereof, DAVID J. MARSHALL and DARRELL HARRIS and others committed or caused to be committed the following overt acts, among others, in the Western District of Louisiana and elsewhere:

1.    The allegations of Count 2 of this Indictment are alleged and incorporated as though fully set forth herein as separate overt acts.

The conspiracy set forth herein, and the above-described overt acts, being in violation of Title 18, United States Code, Section 371. [18 U.S.C. § 371].

COUNT 2

On or about March 1, 1996, in the Western District of Louisiana, the defendants, DAVID J. MARSHALL and DARRELL HARRIS, did knowingly and willfully, by force, violence and intimidation, take from the person and presence of another, approximately $27,000.00 in money belonging to and in the care, custody, control, management and possession of the Premier Bank at 5959 W. 70th Street, Shreveport, Louisiana, the deposits of which were then insured by the Federal Deposit Insurance Corporation, in violation

7

of Title 18, United States Code, Sections 2113(a), and Section 2.

[18 U.S.C. §§ 2113(a), and 2]


                                        A TRUE BILL

                                        *Margaret P Hunter*
                                        _____
                                        FOREMAN, FEDERAL GRAND JURY


MICHAEL D. SKINNER
UNITED STATES ATTORNEY

BY: _____
      JAMES G. COWLES, JR.
      ASSISTANT U.S. ATTORNEY

8